## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

|  |  |
|---|---|
| International Rarities Corp., | BKY Case No.: 11-45512 |
| Debtor. | Chapter 11 |

---

## DEBTOR'S DISCLOSURE STATEMENT

---

International Rarities Corp. (the "Debtor") proposes the following as its Disclosure Statement ("Disclosure Statement") pursuant to section 1125 of the United States Bankruptcy Code.[1]

## I.   INTRODUCTION

On August 19, 2011 ("Filing Date"), the Debtor filed a petition under chapter 11 of the Bankruptcy Code.  The Debtor is filing this Disclosure Statement with respect to its Plan of Reorganization of even date herewith ("Plan").  Terms used in the Disclosure Statement and Plan have the meanings given to them in the Bankruptcy Code unless the context requires otherwise.

The Debtor's Disclosure Statement is furnished pursuant to section 1125 of the Bankruptcy Code and is intended to provide such information as is necessary for creditors to make an informed judgment to accept or reject the Plan.  No representations concerning the Debtor or the Plan that are not included in the Disclosure Statement are authorized by the Debtor.  The Disclosure Statement is only intended as an informational supplement to the Plan, and should be read in conjunction with the Plan.  The terms of the Plan control in the event of any inconsistency between the Plan and Disclosure Statement.

CREDITORS SHOULD NOT RELY ON ANY REPRESENTATIONS OR INDUCEMENTS MADE FOR THE PURPOSE OF INFLUENCING THE DECISION TO ACCEPT OR REJECT THE PLAN, OTHER THAN THOSE IN THIS DISCLOSURE STATEMENT.  ANY SUCH REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR OR TO THE UNITED STATES TRUSTEE, WHO WILL, IF NECESSARY, CONVEY THIS INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE APPROPRIATE.

THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN INDEPENDENTLY AUDITED.  ALL STATEMENTS CONCERNING FINANCIAL DATA ARE MADE IN GOOD FAITH AND ARE INTENDED TO BE AS COMPLETE AND AS ACCURATE AS POSSIBLE.  BANKRUPTCY COUNSEL FOR THE

---

[1] Unless otherwise indicated, all statutory references are to the United States Bankruptcy Code, 11 U.S.C. §101, *et seq*. (the "Bankruptcy Code"), and capitalized terms have the meanings assigned in the Plan.

DEBTOR HAS NOT INDEPENDENTLY VERIFIED ANY OF THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT.

## II.  BACKGROUND OF THE DEBTOR'S BUSINESS
## AND EVENTS LEADING TO BANKRUPTCY

The Debtor was incorporated in 2000 to purchase the assets of International Rarities Group, Inc. on a going-concern basis.  Since the purchase, the Debtor has continued substantially the same business as International Rarities Group, Inc., acting as an agent for the purchase and sale of precious metals, mainly gold and silver.  The Debtor deals in three categories of products:

1.      Numismatic coins, which are independently appraised as to quality and encased in a seal by one of two independent companies: Professional Coin Grading Service and Numismatic Guaranty Corporation.  Numismatic coins generally have a readily ascertainable market value.

2.      Bullion, which is a precious metal in an unworked, pure form.  It does not have any intrinsic value other than the value of the metal, and generally sells at the market spot price.

3.      Circulated coins that are not encased, and the price of which is negotiated by the sales agent.

The Debtor generally does not hold inventory for future customer purchases, but instead purchases coins and bullion as needed to fill orders as they are placed.  Most recent customer orders have been filled by delivery from the Debtor's supplier directly to the customer.  All of product ordered by the Debtor that had not been delivered as of the Filing Date was to be delivered directly to customers for whom such product was ordered, and the Debtor will not take possession of any portion of the goods under such orders.

From 2000 until 2008 the Debtor's revenues grew steadily and there was no indication of potential financial difficulties.  With modest fixed costs and an established name in a growing market, the Debtor's potential for continued growth appeared all but certain.  In late 2008, however, the Debtor was approached by a group that suggested that more ambitious expansion could be financed with funds raised through a private stock offering.

Over the next two years, as a result of mismanagement by the individuals conducting the stock offering, costs incurred in anticipation of the expansion to be financed by the offering, and a significant decline in revenues in 2010, the Debtor's financial situation became critical.  Before all work on the stock offering was halted in early 2011, hundreds of thousands of dollars had been spent and over a million dollars of debt incurred as a result of the offering and expansion.  By July, 2011, the Debtor determined that, while it would be able to pay all creditors in full, it could only do so by reorganizing under chapter 11.

**The IRH Stock Offering**

In mid-2008, Stephen Johnston contacted David Marion, the Debtor's president and sole shareholder, to discuss the possibility of raising capital through a private placement of the

121285595v7 0924198 76202

Debtor's stock. The Debtor's revenues had increased dramatically in the years prior to the meeting with Mr. Johnston. 2008 revenues would total approximately $22.4 million, up from approximately $16.2 million in 2007. Based on the increasing volume and the growth in the Debtor's industry, Mr. Marion believed that substantial expansion was feasible, and expressed an interest in raising capital through a stock offering.

Mr. Johnston worked for International Rarities Group, Inc. and continued working for the Debtor for a short time after it purchased the International Rarities Group, Inc. assets in 2000. After terminating his employment with the Debtor, Mr. Johnston moved to California and worked with an individual named Michael Scott in providing services related to private equity offerings. During a trip back to Minnesota, he met with Mr. Marion and suggested that the Debtor could expand operations with financing raised through a private placement. Mr. Marion expressed interest in the proposal, and asked Mr. Johnston to provide a more detailed plan.

In December, 2008, Michael Scott came to Minneapolis to meet with Mr. Marion. Mr. Marion agreed to Mr. Scott's recommendation that the private offering be for the sale of stock in a to-be-formed corporation to be named International Rarities Holdings, Inc. ("IRH"), which would own one hundred percent of the Debtor's stock.[2] The proceeds of the private offering were going to be used to fund a number of expansion efforts and improvements to the Debtor's information technology systems.

Work immediately began on preparing a private placement memorandum. Mr. Scott stated that his wife, Carolyn Scott, would prepare the private placement memorandum in consultation with corporate and securities lawyers to ensure compliance with federal and state securities laws.

On February 9, 2009, IRH submitted a Form D Notice of Exempt Offering of Securities to the Securities and Exchange Commission ("SEC"). By letter dated April 20, 2009, the SEC notified IRH of the rejection of the notice due to certain deficiencies in the filings. Despite the fact that exemption of the IRH offering was never approved, the Scotts and Mr. Johnston solicited investors until the middle of 2009.

By May, 2009, Mr. Marion became concerned about the Scotts' management of the offering and lack of communication. Among other things, it had become apparent that the Scotts had failed to share material information provided by counsel. In June, 2009, IRH hired Jacob Schlaeger, to assist with the offering. Mr. Schlaeger was working for Merrill Lynch, held a Series 7 license, and was experienced in private placements. Mr. Marion soon learned that, contrary to Ms. Scott's representations, the draft private placement memorandum had not been approved by securities lawyers.

Mr. Marion had been relying on the Scotts to ensure compliance with securities laws, and was deeply troubled by the discovery that the offering had not been conducted with adequate involvement of legal counsel. At Mr. Schlaeger's recommendation, IRH retained Oppenheimer Wolff & Donnelly to provide legal representation regarding corporate and securities matters. All activities related to the private placement were suspended pending review by counsel. IRH soon

---

[2] IRH was incorporated in Nevada in January, 2011, but none of the Debtor's stock was ever transferred to IRH.

121285595v7 0924198 76202

learned that the offering had been significantly mismanaged.  In July, 2009, IRH terminated its relationship with the Scotts and began work on addressing the problems caused by the IRH offering.

**The IRC Stock Offering**

By the time the IRH offering was halted, the Scotts had raised $927,862.78 in subscriptions for IRH stock.  On the Scott's advice, those funds had not been held in escrow, but had been used in operations, expansion efforts, and for the payment of commissions claimed on account of subscriptions and other costs related to the offering.

Working with Mr. Schlaeger and legal counsel, the Debtor resumed efforts to complete a private offering.  The corporate structure contemplated in the original private placement memorandum, under which the Debtor would be a wholly-owned subsidiary of IRH, was abandoned.  Instead, the offering was to be for the sale of stock in the Debtor.  The IRC offering was still intended to finance expansion and technology improvements, but the new memorandum also stated that a portion of the proceeds would be used to refund amounts paid for subscriptions for IRH stock.

Although there was never a formal relationship between the Debtor and IRH, the IRH private placement memorandum contemplated that the Debtor would be IRH's wholly-owned subsidiary.  Substantially all business operations would be carried on by the Debtor, and the primary purpose of the offering was to fund the Debtor's expansion.  Pending the anticipated closing of the private placement, funds drawn from the IRH investors' deposits were generally booked as loans from IRH to the Debtor.  As of the end of 2009, the outstanding balance owing on the inter-company loan was $713,202.00.

As he had done with respect to the IRH offering, Mr. Marion delegated substantially all responsibility for the management of the second offering.  In this case, Mr. Schlaeger was primarily responsible, but Mr. Marion was able to confirm that attorneys were involved in the process and thus ensure that the problems of the IRH offering were not repeated.

The preparation of the second private placement memorandum began in October, 2009 and was completed and approved by counsel in March, 2010.  For the remainder of 2010, Mr. Schlaeger sought investors, but without success.  No subscriptions had been received by the time the offering expired on December 31, 2010.

On January 14, 2011, Mr. Schlaeger informed the Debtor that he was voluntarily terminating his employment immediately.  No further efforts have been made to raise capital through a stock offering.

In June, 2011, the SEC began an investigation of the stock offerings.  On September 7, 2011, search warrants were executed against David Marion at the Debtor's offices.  The Debtor has cooperated with authorities' investigations, and remains committed to ensuring that investors recover the full amount paid in the IRH offering.

121285595v7 0924198 76202

**Deteriorating Cash Flow**

The Debtor's revenues for 2009 were the highest in its history. Also in 2009, however, it began to experience the loss of employees that would lead to a significant decline in revenues. The employee attrition can be attributed, in large part, to the significant growth in sales. As sales increased, some salespeople decided that they would attempt to operate independently, frequently with client lists developed by the Debtor. More than 20 employees began competing businesses in 2009 and 2010, and the Debtor has reason to believe that a number of these competing businesses used confidential information in violation of employment contracts and Minnesota law.

Because of this loss of experienced sales staff, the Debtor's revenues declined from approximately $24 million in 2009 to less than $16 million in 2010. Attrition had largely abated by the end of 2010, and through the first six months of 2011, the Debtor's revenues were just over $7.4 million, putting the Debtor on a pace to approximately match those in 2010.

The decline in revenue was particularly problematic, as it occurred at the same time that the Debtor was incurring substantial additional costs associated with the private offerings and expansion efforts, such as those for professional services. In 2008, when the Debtor's revenues were nearly $23 million, its legal and accounting-related expenses were over $74,000.00. In 2009, with revenues of $16 million, the same expenses were approximately four times higher.

Another significant liability associated with the IRH offering was that related to a lease for an office that was vacated when the relationship with the Scotts ended. In addition to their responsibilities related to the IRH offering, the Scotts were to manage a California office to be known as "IRC West." To facilitate the opening of IRC West, on March 4, 2009 the Debtor executed a lease for office space in San Diego.

On or about January 10, 2011, the landlord commenced a civil action seeking damages arising out of the breach of the March 4, 2009 lease. The case was captioned *RREEF America REIT II Portfolio, L.P. v. International Rarities Corporation aka International Rarities Corp., a Minnesota corporation; David L. Marion, an individual as Guarantor; and Does 1 through 10, inclusive*, Case No. 37-2011-0083741-CU-BC-CTL (Superior Court of California, County of San Diego), and seeks damages "estimated to exceed $200,000.00."

In recent months the Debtor has also incurred significant costs defending in a civil action pending in the United States District Court for the Northern District of Florida, captioned *Dean Dellinger v. International Rarities Corporation*, Case No.: 3:10cv323/RS/EMT (the "Dellinger Action"). The Dellinger Action involves claims by a former customer based on allegations of misrepresentations regarding the value of coins that the Debtor purchased from the customer and other coins that the customer purchased from the Debtor. The customer has alleged that he suffered damages in excess of $335,000.00, and has asserted that he is entitled to treble damages under Florida's civil theft statute.

The Dellinger Action was originally scheduled for trial on July 25, 2011. After the Debtor advised the court and opposing counsel of the intention to file a petition under chapter 11, the trial date was continued to August 22, 2011. The Debtor disputes the allegations on a number of

121285595v7 0924198 76202

grounds, but could no longer afford the cost of litigation, particularly because no outcome would alter the need for reorganization under chapter 11.

**The Bankruptcy Filing**

The Debtor has been working to ensure that it is able to repay all obligations owing to customers as well as any that might arise out of the IRH stock offering. By May, 2011, it was clear that the Debtor's revenues would not be sufficient to promptly pay the outstanding liabilities from the private offering, and the costs of ongoing litigation and ordinary operations. It would be possible to pay creditors in full, but it was finally decided that the only way of doing so would be to reorganize under chapter 11.

The Debtor determined that restructuring efforts would be best served by appointment of an independent executive without any prior relationship to the Debtor. On July 16, 2011 Mr. Marion stepped down as president and chief executive officer, and, in his capacity as the Debtor's sole director, adopted resolutions:

      1.    Authorizing and directing the Debtor to file a petition under chapter 11 of the United States Bankruptcy Code; and

      2.    Appointing Stephen J. Hastings as president and chief executive officer.

Mr. Hastings has experience in managing distressed businesses, and since his appointment he has been responsible for day-to-day management and has also worked on projections and accounting matters relevant to reorganization, including preparation of a plan of reorganization. Under the Plan, Mr. Hastings will continue to serve as president and chief executive officer.

In formulating the Plan, the overarching goal was to provide for payment of all claims in full as quickly as possible. To minimize damage to customer relations that might result from a protracted bankruptcy case, the Debtor prepared the Plan so it would be ready to file shortly after the filing of the bankruptcy case.

**Plan Funding**

Payments under the Plan will be funded with income generated by the Debtor's operations and by payments made on a loan receivable from David Marion. As the Debtor's sole shareholder, Mr. Marion received corporate distributions in addition to his compensation as an employee. When the Debtor's performance declined substantially, a significant amount of distributions were determined to be in excess of what could be authorized. As a result, Mr. Marion became liable for return of such distributions. At the end of 2010, Mr. Marion's liability to the Debtor was $454,533.00 (the "Officer Loan").

Also at the end of 2010, liability on a $713,202.00 inter-company loan from IRH to the Debtor was transferred to Mr. Marion, who already had a loan obligation to IRH in the amount of $183,155.00, resulting in a total liability of $896,357.00 (the "IRH Officer Loan").

Mr. Marion has agreed to pay both the Officer Loan and the IRH Officer Loan, with interest at the rate of four percent per annum, with monthly installments of principal and interest being paid

121285595v7 0924198 76202

according to a five-year amortization schedule.  All payments made on account of the Officer Loan will be used to fund Plan payments to unsecured creditors.  By reason of the mandatory subordination of Class 3 claims discussed below, no payments on account of Class 3 claims will be made out of amounts paid on the Officer Loan until all other unsecured claims have been paid in full.

The IRH Officer Loan will remain the property of IRH, and amounts collected on account of the IRH Officer Loan will be used solely to fund payments on liabilities of IRH, which will be made at the same time as payments made on account of Class 2 claims.  As IRH has no ongoing operations, IRC may act as IRH's Officer Loan for purposes of collection and disbursement.  Except as otherwise provided in the Plan, the Debtor will hold any amounts collected on the IRH Officer Loan in trust for the benefit of IRH's creditors, and amounts so collected will not be subject to the claims of creditors of the Debtor.

Payments on account of the IRH Officer Loan will be used to make payments on account of the claims included in Class 3.  After Class 3 claims have been paid in full, all rights to the outstanding balance of the IRH Officer Loan, if any, will be assigned to the Debtor and will be added to the balance of the IRC Officer Loan.  IRH's collection of the IRH Officer Loan and payments to the holders of Class 3 claims as provided herein will be deemed to be in full and final satisfaction of all of the Debtor's claims against IRH, including those for indemnification.

**Projections**

Attached as Exhibit A are projections of the Debtor's operations during the Plan term.  The projections are based on the Debtor's historical performance and recent sales trends.

### III.  DESCRIPTION OF THE PROPOSED
### CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

**3.1     Classification of Claims**

A plan of reorganization provides for the treatment of the different claims against and equity interests in a debtor.  Under the Bankruptcy Code, certain types of claims are included in "classes," while others are not.  A claim may only be included in a class if it is substantially similar to other claims in that class.

The Debtor is required to identify those classes that are impaired and those that are unimpaired under the Plan.  Holders of classified claims that are impaired are entitled to vote to accept or reject a plan. Holders of claims that are unimpaired are deemed to accept a plan, and creditors that will receive nothing on account of their claims are deemed to reject a plan.  Holders of claims that are deemed to either reject or accept are not entitled to vote.

A claim is impaired if the plan alters the legal, equitable, or contractual rights associated with the claim outside of bankruptcy.  Even though the Debtor's Plan provides for payment in full of all claims, it does so on terms that could not be imposed outside of bankruptcy.  As such, with the exception of Class 4, all classes of claims are impaired under the Plan and entitled to vote.

121285595v7  0924198  76202

The Debtor's sole shareholder, David Marion, is the only member of the single class of interests. Under the Plan, all stock would remain in place, and the class of interests is an unimpaired, deemed accepting class.

The Plan has four classes of claims. Class 1 consists of the claim of Wells Fargo Bank, National Association, the only secured creditor. Class 4 consists of certain claims for payment of commissions and commissions that are entitled to priority under the Bankruptcy Code. Classes 2 and 3 consist of different types of unsecured, non-priority claims.

IRH investors' claims, which are in Class 3, are not substantially similar to any other claims against the Debtor and are classified separately from other claims. Among other things, Class 3 claims arise from the rescission of a purchase of common stock of an affiliate of the Debtor. Under section 501(b) of the Bankruptcy Code, to the extent these claims are asserted against the Debtor, they are to be subordinated to other creditors' claims. The Plan therefore provides for payments by the Debtor on account of Class 3 claims only to the extent that such claims remain outstanding after all other unsecured creditors have been paid in full. Prior to such time, however, payments on account of Class 3 claims will be made solely out of amounts paid on account of the IRH Officer Loan.

## 3.2    Executory Contracts and Unexpired Leases

A debtor in possession has certain options with respect to executory contracts and unexpired leases. It may: (i) assume the contract or lease, (ii) reject the contract or lease, or (iii) assume and assign the contract or lease. The treatment that any contract or lease receives in the course of a bankruptcy case dictates the nature of the claim that the non-debtor party may have by reason of the contract or lease. Rejection of a contract or lease will give rise to a general unsecured claim for damages and pre-petition arrearages, while the assumption of a contract or lease will require that all defaults be cured. The treatment of the various executory contracts and unexpired leases to which the Debtor is a party is specified in the Plan.

From and after the date on which an order confirming the Plan is entered, the Debtor will perform its obligations according to the terms of all assumed contracts. Arrearages outstanding as of the date on which a contract or lease is assumed, will be paid promptly after the Effective Date, or as otherwise agreed to by the Debtor and the other party.

Claims arising out of the rejection of an executory contract or unexpired lease will be treated as unsecured claims. Unless otherwise ordered by the Court, the deadline for filing a proof of claim for damages arising from rejection of a contract or lease will be fixed at 30 days from the date on which an order confirming the Plan is entered. THE INFORMATION PROVIDED HEREIN CONSTITUTES NOTICE OF THE DEADLINE FOR ASSERTING CLAIMS FOR DAMAGES FROM REJECTION OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE.

### Contracts and Leases not Specified

If the Debtor is a party to any executory contracts or unexpired leases that are not specifically identified in the Plan, all such executory contracts and unexpired leases will be **REJECTED** upon confirmation, except: (i) as may be provided for in any prior Court order entered with

121285595v7 0924198 76202

respect to a motion for assumption or rejection of such executory contract or unexpired lease; or (ii) as may be provided for in any motion that is pending as of the date of the hearing on confirmation of the Plan. Except as may be provided otherwise herein, such rejection will be effective as of the date on which an order confirming the Plan is entered.

## 3.3    Summary of Estimated Recoveries Under the Plan

According to Debtor's books and records, the following chart represents the Debtor's good faith estimate of the claims that may be subject to treatment under the Plan. The chart is intended to show the upper limit of known claims, and does not constitute an admission that any of the claims asserted thus far are allowable in the amount stated. The Debtor reserves all rights to object to claims and to challenge or seek avoidance of liens and security interests.

| Type/Class of Claim | Approx. Total Claims | Estimated Recovery Under Plan | Percent Recovery |
|---|---|---|---|
| Professional Fees[3] | $100,000.00 | $100,000.00 | 100% |
| Priority Tax Claims | $321.00 | $321.00 | 100% |
| Class 1 – Wells Fargo | $52,000.00 | $52,000.00 | 100% |
| Class 2 – General Unsecured Claims | $2,200,000.00 | $2,200,000.00 | 100% |
| Class 3 – IRH Investor Claims[4] | $851,000.00 | $851,000.00 | 100% |
| Class 4 – Priority Wages | - 0 - | - 0 - | - |

## IV. PROOFS OF CLAIMS AND OBJECTIONS TO CLAIMS

Creditors may file proofs of claims with the Bankruptcy Court pursuant to Bankruptcy Rules 3001 and 3002. Proof of claim forms, along with directions and notice of filing deadlines, will be mailed to all creditors at addresses provided by the Debtor at the start of the Bankruptcy Case. The forms are also available on the Bankruptcy Court's website (www.mnb.uscourts.gov) or may be obtained by contacting the Debtor's counsel.

Claims may be asserted for damages arising out of the rejection of executory contracts and unexpired leases, whether rejected under the Plan or pursuant to a motion filed during the pendency of the Bankruptcy Case. Unless otherwise ordered by the Bankruptcy Court, such claims must be asserted by the filing of a proof of claim within 30 days after the Confirmation Date. SUBJECT TO ANY CONTRARY OR INCONSISTENT ORDER OF THE BANKRUPTCY COURT, THE PLAN ESTABLISHES AND CONSTITUTES NOTICE OF

---

[3] The Disclosure Statement is being filed less than three weeks after the Debtor commenced this bankruptcy case, and total professional fees cannot be estimated with certainty. The Debtor's current estimate assumes fees for the Debtor's attorneys only and are subject to substantial revision depending on a number of factors, including the amount of litigation arising out of the bankruptcy proceedings and the ability of the Debtor to confirm the Plan quickly.

[4] The Debtor projects that all Class 3 claims will be paid in full out of the payments made on a loan payable by David L. Marion to IRH.

121285595v7 0924198 76202

THE DEADLINE FOR ASSERTING CLAIMS FOR DAMAGES FROM REJECTION OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE.

Certain creditors may hold or assert claims for the payment of administrative expenses of the types described in section 503(b) of the Bankruptcy Code. Unless otherwise ordered by the Bankruptcy Court, Administrative Claims must be asserted in the manner provided under applicable rules not later than thirty days after the Confirmation Date. SUBJECT TO ANY CONTRARY OR INCONSISTENT ORDER OF THE BANKRUPTCY COURT, THE PLAN ESTABLISHES AND CONSTITUTES NOTICE OF THE DEADLINE FOR ASSERTING ADMINISTRATIVE EXPENSE CLAIMS.

## V. CLAIMS OF THE DEBTOR AGAINST OTHERS

A debtor-in-possession has standing to assert certain claims against third parties for the benefit of the bankruptcy estate. Among the rights of recovery that are available to a debtor-in-possession are those based on avoidance of preferences and fraudulent transfers ("Avoidance Actions").

A preference is a payment or other transfer of property to or for the benefit of a creditor, before the bankruptcy case was commenced, on account of an antecedent debt, that:

> (1) was made while the debtor was insolvent;

> (2) was made within the time period(s) specified in Section 547(b)(4) of the Bankruptcy Code; and

> (3) enabled the creditor receiving the transfer to receive more than the creditor would have received if the transfer had not been made and the debtor was liquidated under chapter 7 of the Bankruptcy Code.

After avoidance of a preferential transfer, the preference defendant is required to return the payment or other transfer made, and ordinarily has an allowed unsecured claim in the amount of the returned preference.

An avoidable fraudulent conveyance is a transfer by the debtor either:

> (a) undertaken with actual intent to hinder, delay, or defraud any present or future creditor; or

> (b) a transaction under which the debtor received less than a reasonably equivalent value, and:

>> (i) the debtor was insolvent on the date the transfer was made or such obligation was incurred or became insolvent as a result of such transfer or obligation;

>> (ii) the debtor was engaged in business or a transaction, or was about to engage in such business or transaction for which the debtor's remaining assets would be insufficient; or

121285595v7 0924198 76202

(iii) the debtor intended to incur or believed that it would incur debts that would be beyond the debtor's ability to pay as such debts matured.

The Debtor has identified a number of transfers with respect to which preference or fraudulent transfer claims might be asserted. Most of the transfers that have been identified as potentially avoidable were made on account of services performed by David Marion or on account of his ownership interest in the Debtor. All such payments made in 2010 were made as distributions on account of Mr. Marion's stock, while all payments in 2011 were made on account of services.

In the year before the Filing Date, the Debtor paid $377,285.46 on account of services provided by Mr. Marion. Of this amount, $186,065.17 was paid directly to Mr. Marion's former spouse, Dana Golden, in payment of child support and maintenance obligations. Also in the year before the Filing Date, distributions in the amount of $81,572.80 were made on account of Mr. Marion's stock, $37,230.82 of which was paid to Ms. Golden for support and maintenance obligations.

As discussed in Article II above, distributions in 2010 were determined to be in excess of what the Debtor was authorized to make. The distributions are therefore included in the Officer Loan, which Mr. Marion is obligated to repay over five years. All amounts paid on account of the Officer Loan will be used to fund payments under the Plan. In effect, the Debtor will recover the full value of all distributions for the benefit of creditors, and it does not intend to seek avoidance of any distributions.

Mr. Marion has agreed to pay the Officer Loan as rapidly as can be expected based on his projected income during the Plan term. Particularly because the Plan provides for the payment of all known claims in full, the Debtor believes that there would be no value in pursuing any Avoidance Actions against Mr. Marion, Ms. Golden, or any other party.[5] The Plan therefore does not provide for the retention of any Avoidance Actions.

The Debtor has a claim against IRH for indemnification based on liability arising out of the IRH stock offering. Prior to the Filing Date, the Debtor had paid $74,040.00 on account of such claims, leaving an estimated balance of $850,822.78. Because the IRH-related liabilities are subject to subordination under section 510 of the Bankruptcy Code, the Plan only provides for payment on those claims after other unsecured claims have been paid in full.

The IRH Officer Loan will be repaid on the same terms as the Officer Loan, and IRH will use the proceeds to pay its own liabilities. IRH's satisfaction of debt will reduce the Debtor's liability, thereby reducing the Debtor's contingent indemnification claim against IRH on a dollar-for-dollar basis. IRH will assign its rights in and to the IRH Officer Loan after all other IRH

---

[5] As any recovery of a preferential transfer typically results in an unsecured claim in an amount equal to the amount recovered, in the case of a plan under which creditors will be paid in full the only potential benefit of a successful preference action would be to facilitate larger payments to some creditors in the short term. In this case, the relatively small amounts that might be recovered as preferences would not have any significant impact on the amount or timing of Plan payments.

121285595v7 0924198 76202

indebtedness has been satisfied in satisfaction of any claim for indemnification on account of payments made prior to the Filing Date.

The Plan provides for the Debtor's retention of all other claims against third parties ("Third Party Claims"). Substantially all of the Third Party Claims that the Debtor has identified are against former employees, contractors, and other agents for misappropriation of the Debtor's customer lists and other proprietary information in violation of employment and confidentiality agreements and the Minnesota Uniform Trade Secrets Act. The Debtor is confident that liability could be established in many instances, but is currently unable to estimate damages or evaluate the likelihood of collection in any particular case.

Recoveries on account of Third Party Claims, after payment of costs and expenses associated with such recovery, will be paid to the holders of Class 2 claims on a pro rata basis. In the event that recoveries on account of Third Party Claims remain after all other unsecured claims have been paid in full, such remainder will be paid to the holders of Class 3 claims on a pro rata basis until Class 3 claims have been paid in full.

## VI. POST CONFIRMATION

After confirmation of the Plan, operations and events will continue to be governed by certain provisions of the Plan, as set forth below.

### 6.1 Means for Execution

### 6.1.1 Plan Funding

Plan payments will be funded by income earned through the Debtor's continued operations and through payments made on account of the Officer Loan. Projections of the Debtor's cash flow during the Plan term, including projected payments under the Plan, are attached as Exhibit A. In addition, recoveries on Third Party Claims in excess of costs expenses of such recoveries will be paid to unsecured creditors on a pro rata basis.

### 6.1.2 Continued Existence

After the Effective Date, the Debtor will continue to exist in accordance with laws applicable to Minnesota corporations. The Debtor's articles, bylaws, and other organizational documents will remain in effect according to their terms as of the Effective Date, except that such articles, bylaws, and other organizational documents will be amended to bar the issuance of non-voting stock.

### 6.1.3 Implementation of Plan

The Plan may be modified in the manner provided for under Section 1127 of the Bankruptcy Code. The Debtor will give notice of any proposed modification to the United States Trustee and to any other parties designated by the Court. The Debtor reserves the right to make such modifications at any hearing on confirmation as may be necessary to facilitate confirmation of the Plan.

121285595v7 0924198 76202

The Debtor's obligations under the Plan are contingent upon entry of an order confirming the Plan, and said order not being stayed, appealed, or otherwise challenged before the expiration of the applicable deadline; provided, however, that the Debtor may, in its sole discretion, choose to undertake and perform its obligations under the Plan notwithstanding the pendency of an appeal.

### 6.1.4   Management

Stephen Hastings will continue to serve as the Debtor's president and chief executive officer and will be compensated at the rate of $250.00 per hour.  In addition, Mr. Hastings will be entitled to receive health and dental insurance, participate in the Debtor's 401(k) plan, and enjoy all other benefits as are available to the Debtor's other employees.  For purposes of the Debtor's projections, the Debtor has estimated that Mr. Hastings will work approximately sixty hours per month during the Plan term.

During the Plan term, Mr. Hastings's hourly rate may be increased from time to time, provided that such increases do not deviate materially from increases that would result from tying raises directly to changes in the consumer price index.

Mr. Marion will continue to work for the Debtor on a contract basis, performing services related to sales staff management and customer relations.  Monthly fees under the contract with Mr. Marion will be $10,000.00 until all payments required under the Plan have been made.  In addition, Mr. Marion will earn commissions on the following terms: (1) For sales generated in whole or in part by Mr. Marion, he will be entitled to a share of the 40% of gross profit that corresponds to his role in the sale; and (2)  For all sales to customers who were not originated or actively managed by any current sales representative, Mr. Marion will receive a commission equal to 15% of the gross profit.

### 6.1.5   Exemption from Certain Taxes

To the full extent provided for under Section 1146 of the Bankruptcy Code, the making or delivery of any instrument of transfer in the performance of obligations pursuant to the Plan shall be exempt from any stamp or similar tax.

### 6.2     Reservation of Rights, Powers and Jurisdiction

The Plan generally provides for the Debtor's retention of all rights, powers, and interests of the estate, other than those related to Avoidance Actions, and for the Bankruptcy Court's continued jurisdiction over all matters related to the Plan.

### VII.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following is intended only as a summary of potential federal income tax consequences of the Plan.  Neither this summary nor any other information provided herein should be construed to be the opinion of the Debtor or the Debtor's counsel for purposes of tax planning or reporting. Neither the IRS nor any other taxing authority has participated in the preparation of these materials, and this discussion of tax consequences is not binding on the IRS or any other taxing

121285595v7  0924198  76202

authority. In general, because the Plan provides for payment of all claims in full, it is not expected to have any significant tax consequences on creditors or the Debtor.

To the extent that the Plan results in certain creditors having reportable loss or gain, the appropriate treatment for purposes of federal income taxes will depend on a number of factors, including, but not limited to, the following: (i) whether the creditor's claim arises out of a transaction that was of a personal rather than a business nature; (ii) the tax basis of the creditor's claim; and (iii) the degree to which the creditor may be able to claim that the value of a particular claim is affected by the Plan.

With respect to the Debtor, if the Plan were to result in the discharge of indebtedness a possible tax consequence of the Plan would be that certain tax attributes, including, but not limited to, the Debtor's basis in property, could be reduced to the extent debt is discharged.

The foregoing discussion does not constitute tax advice, and is only intended to provide a summary of certain material tax issues that each creditor might consider in deciding how to vote on the Plan. The tax consequences for any particular creditor or other party in interest may involve a large number of variables, and the Debtor therefore makes no representations as to the specific tax implications for any creditor. Creditors and other parties in interest are therefore strongly urged to seek professional advice regarding the tax consequences of the Plan.

PURSUANT TO U.S. TREASURY REGULATIONS, PLEASE BE ADVISED THAT ANY U.S. FEDERAL TAX ADVICE INCLUDED IN THIS COMMUNICATION (1) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, TO AVOID ANY U.S. FEDERAL TAX PENALTIES, AND (2) IS PROVIDED TO SUPPORT THE PROMOTION OR MARKETING OF THE PLAN. ANY TAXPAYER RECEIVING THIS COMMUNICATION SHOULD SEEK ADVICE FROM AN INDEPENDENT TAX ADVISOR.

## VIII.  ALTERNATIVES TO THE PLAN OF REORGANIZATION

One alternative to confirmation of the Plan is conversion of the case to a liquidation case under chapter 7 of the Bankruptcy Code. In liquidation, all of the Debtor's assets would be used first to satisfy claims held by the secured creditor, and the general unsecured creditors would receive a distribution only if assets were available after payment of secured claims, priority claims, including administrative expense claims, and taxes incurred as a result of liquidation.

The Debtor has estimated that the liquidation value of its assets is as follows:

| Asset Description | Estimated Liquidation Value |
|---|---|
| Equipment | $500.00 |
| Customer and Supplier Lists | $5,000.00 |
| Avoidance Actions | 0.00 |
| Third Party Actions | unknown |
| Officer Loan/Indemnification Claim | $1,350,890.00 |
| **Total** | $1,356,390.00 |

14

All of the assets other than Avoidance Actions and Third Party Actions are subject to the secured claim of Wells Fargo Bank, National Association. The balance owing on the secured claim as of the Filing Date was approximately $52,000.00, leaving a total of $1,304,390.00 available for payment of unsecured claims, including administrative expense and other priority claims.

The Debtor intends to pursue Third Party Actions, and the estimated value of those claims in liquidation is the same as the estimated value in reorganization. With respect to the estimated value of Avoidance Actions, the lack of any projected value in liquidation is based on the fact that the only significant claims identified are those that might be asserted against David Marion.

Most of the Avoidance Actions against Mr. Marion would be for the recovery of excessive distributions. As discussed above, the excess distributions are already included in the Officer Loan, and any value to be realized on account of fraudulent transfer claims would reduce the value of the Officer Loan. Although any amounts recovered through Avoidance Actions rather than through repayment of the Officer Loan would not be subject to the Wells Fargo security interest, because of the relatively low amount owing on the secured claim makes this distinction insignificant under any scenario.

Furthermore, Mr. Marion's ability to satisfy any liability depends largely on his continued earnings from the Debtor. For purposes of the Debtor's liquidation analysis, the Debtor has assumed realization of the full value of the Officer Loan and, through payment of the IRH Officer Loan, of the indemnification claim. Because Mr. Marion's ability to pay these amounts depends on his future employment, and his employment prospects in the event of liquidation are uncertain, there is considerable uncertainty regarding this assumption. Even compared to this most optimistic liquidation analysis, however, creditors fare substantially better under the Plan.

## IX. CONFIRMATION STANDARDS

To be confirmed, the Plan must be accepted by at least one impaired class of claims. For a class to accept the Plan, an affirmative vote must be cast by creditors holding at least two thirds in amount and more than fifty percent in number of allowed claims with respect to which a vote is cast.

In the event that one or more impaired classes reject the Plan, the Bankruptcy Court may nevertheless confirm the Plan if it finds that the Plan does not discriminate unfairly and accords fair and equitable treatment to the rejecting classes. Generally, this means that, the Plan may be confirmed even if one or more classes of claims or interests rejects the Plan so long as the Plan provides that (1) each holder of a claim or interest in a rejecting class receives the value of that claim or interest; or (2) no holder of a claim or interest junior to those held by members of a rejecting class will receive or retain any property under the Plan. The Debtor hereby specifically reserves the right to seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.

121285595v7 0924198 76202

## X. CONCLUSION

The Debtor believes that acceptance of the Plan is in the best interest of all parties and therefore urges all creditors to vote in favor of the Plan.

Dated: September 9, 2011

INTERNATIONAL RARITIES CORP.

By: _____
Stephen J. Hastings
Its: President

Dated: September 9, 2011

HINSHAW & CULBERTSON LLP


___/e/ Joel D. Nesset_____
Thomas G. Wallrich (213354)
Joel D. Nesset (030475X)
333 South Seventh Street, Suite 2000
Minneapolis, MN 55402
Telephone: 612-333-3434
Fax: 612-334-8888

ATTORNEYS FOR DEBTOR

16

**<u>Exhibit A – Debtor's Projections</u>**

| Monthly Forecast | Jan, 2012 | Feb, 2012 | March, 2012 | April, 2012 | May, 2012 | June, 2012 | July, 2012 | Aug, 2012 | Sept, 2012 | Oct, 2012 | Nov, 2012 | Dec, 2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sales | 750,000 | 757,500 | 765,075 | 772,726 | 780,453 | 788,258 | 796,140 | 804,102 | 812,143 | 820,264 | 828,467 | 836,751 |
| | | | | | | | | | | | | |
| Cost of Goods Sold | | | | | | | | | | | | |
| Coins | 600,000 | 606,000 | 612,060 | 618,181 | 624,362 | 630,606 | 636,912 | 643,281 | 649,714 | 656,211 | 662,773 | 669,401 |
| Commission | 82,350 | 83,174 | 84,005 | 84,845 | 85,694 | 86,551 | 87,416 | 88,290 | 89,173 | 90,065 | 90,966 | 91,875 |
| Total COGS | 682,350 | 689,174 | 696,065 | 703,026 | 710,056 | 717,157 | 724,328 | 731,572 | 738,887 | 746,276 | 753,739 | 761,276 |
| | | | | | | | | | | | | |
| Gross Margin | 67,650 | 68,327 | 69,010 | 69,700 | 70,397 | 71,101 | 71,812 | 72,530 | 73,255 | 73,988 | 74,728 | 75,475 |
| | | | | | | | | | | | | |
| Rent | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 |
| Marion Contract | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| President pay | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| Other employee wage | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 |
| Employee Benefits | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Phone System | 3,206 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 |
| Parking | 510 | 510 | 510 | 510 | 510 | 510 | 510 | 510 | 510 | 510 | 510 | 510 |
| Coffee Supplier | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 |
| Medica | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 |
| Pitney Bowes | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Pitney Bowes Global | 1,800 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 |
| Qwest | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 |
| Solutions on Hold | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 |
| Tela, Inc. | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 |
| Transcend Communications | 1,883 | 377 | 377 | 377 | 377 | 377 | 377 | 377 | 377 | 377 | 377 | 377 |
| US Bank - Copier | 3,975 | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 |
| Wells Fargo Business Loan | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 |
| Total Expenses | 67,183 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 |
| | | | | | | | | | | | | |
| Operating Income | 467 | 10,173 | 10,856 | 11,546 | 12,243 | 12,947 | 13,658 | 14,376 | 15,101 | 15,834 | 16,574 | 17,321 |
| | | | | | | | | | | | | |
| Professional Fees | 5,000 | 15,000 | 15,000 | 15,000 | 15,000 | 10,000 | 15,000 | 10,000 | - | - | - | - |
| | | | | | | | | | | | | |
| Income After Admin Expense | (4,533) | (4,828) | (4,144) | (3,454) | (2,757) | 2,947 | (1,342) | 4,376 | 15,101 | 15,834 | 16,574 | 17,321 |
| | | | | | | | | | | | | |
| IRC Officer Loan Payment | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 |
| | | | | | | | | | | | | |
| Available for Class 2 Payments | 3,837 | 3,543 | 4,226 | 4,916 | 5,613 | 11,317 | 7,028 | 12,746 | 23,471 | 24,204 | 24,944 | 25,691 |

**Exhibit A**
**International Rarities Corp.**
**Plan Projections**

| Monthly Forecast | Jan, 2013 | Feb, 2013 | March, 2013 | April, 2013 | May, 2013 | June, 2013 | July, 2013 | Aug, 2013 | Sept, 2013 | Oct, 2013 | Nov, 2013 | Dec, 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sales | 845,119 | 853,570 | 862,106 | 870,727 | 879,434 | 888,228 | 897,111 | 906,082 | 915,143 | 924,294 | 933,537 | 942,872 |
| | | | | | | | | | | | | |
| Cost of Goods Sold | | | | | | | | | | | | |
| Coins | 676,095 | 682,856 | 689,685 | 696,581 | 703,547 | 710,583 | 717,688 | 724,865 | 732,114 | 739,435 | 746,830 | 754,298 |
| Commission | 92,794 | 93,722 | 94,659 | 95,606 | 96,562 | 97,527 | 98,503 | 99,488 | 100,483 | 101,487 | 102,502 | 103,527 |
| Total COGS | 768,889 | 776,578 | 784,344 | 792,187 | 800,109 | 808,110 | 816,191 | 824,353 | 832,597 | 840,923 | 849,332 | 857,825 |
| | | | | | | | | | | | | |
| Gross Margin | 76,230 | 76,992 | 77,762 | 78,540 | 79,325 | 80,118 | 80,919 | 81,729 | 82,546 | 83,371 | 84,205 | 85,047 |
| | | | | | | | | | | | | |
| Rent | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 |
| Marion Contract | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| President pay | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| Other employee wage | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 |
| Employee Benefits | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Phone System | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 |
| Parking | 510 | 510 | 510 | 510 | 510 | 510 | 510 | 510 | 510 | 510 | 510 | 510 |
| Coffee Supplier | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 |
| Medica | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 |
| Pitney Bowes | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Pitney Bowes Global | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 |
| Qwest | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 |
| Solutions on Hold | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 |
| Tela, Inc. | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 |
| Transcend Communications | 377 | 377 | 377 | 377 | 377 | 377 | 377 | 377 | 377 | 377 | 377 | 377 |
| US Bank - Copier | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 |
| Wells Fargo Business Loan | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 |
| Total Expenses | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 |
| | | | | | | | | | | | | |
| Operating Income | 18,076 | 18,838 | 19,608 | 20,386 | 21,171 | 21,964 | 22,765 | 23,575 | 24,392 | 25,217 | 26,051 | 26,893 |
| | | | | | | | | | | | | |
| Professional Fees | - | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | |
| Income After Admin Expense | 18,076 | 18,838 | 19,608 | 20,386 | 21,171 | 21,964 | 22,765 | 23,575 | 24,392 | 25,217 | 26,051 | 26,893 |
| | | | | | | | | | | | | |
| IRC Officer Loan Payment | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 |
| | | | | | | | | | | | | |
| Available for Class 2 Payments | 26,446 | 27,208 | 27,978 | 28,756 | 29,541 | 30,334 | 31,135 | 31,945 | 32,762 | 33,587 | 34,421 | 35,263 |

| Monthly Forecast | Jan, 2014 | Feb, 2014 | March, 2014 | April, 2014 | May, 2014 | June, 2014 | July, 2014 | Aug, 2014 | Sept, 2014 | Oct, 2014 | Nov, 2014 | Dec, 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sales | 952,301 | 961,824 | 971,442 | 981,157 | 990,968 | 1,000,878 | 1,010,887 | 1,020,996 | 1,031,206 | 1,041,518 | 1,051,933 | 1,062,452 |
| | | | | | | | | | | | | |
| Cost of Goods Sold | | | | | | | | | | | | |
| Coins | 761,841 | 769,459 | 777,154 | 784,925 | 792,775 | 800,702 | 808,709 | 816,796 | 824,964 | 833,214 | 841,546 | 849,962 |
| Commission | 104,563 | 105,608 | 106,664 | 107,731 | 108,808 | 109,896 | 110,995 | 112,105 | 113,226 | 114,359 | 115,502 | 116,657 |
| Total COGS | 866,403 | 875,067 | 883,818 | 892,656 | 901,583 | 910,599 | 919,705 | 928,902 | 938,191 | 947,573 | 957,048 | 966,619 |
| | | | | | | | | | | | | |
| Gross Margin | 85,898 | 86,757 | 87,624 | 88,500 | 89,385 | 90,279 | 91,182 | 92,094 | 93,015 | 93,945 | 94,884 | 95,833 |
| | | | | | | | | | | | | |
| Rent | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 |
| Marion Contract | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| President pay | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| Other employee wage | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 |
| Employee Benefits | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Phone System | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 |
| Parking | 510 | 510 | 510 | 510 | 510 | 510 | 510 | 510 | 510 | 510 | 510 | 510 |
| Coffee Supplier | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 |
| Medica | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 |
| Pitney Bowes | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Pitney Bowes Global | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 |
| Qwest | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 |
| Solutions on Hold | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 |
| Tela, Inc. | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 |
| Transcend Communications | 377 | 377 | 377 | 377 | 377 | 377 | 377 | 377 | 377 | 377 | 377 | 377 |
| US Bank - Copier | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 |
| Wells Fargo Business Loan | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 |
| Total Expenses | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 |
| | | | | | | | | | | | | |
| Operating Income | 27,744 | 28,603 | 29,470 | 30,346 | 31,231 | 32,125 | 33,028 | 33,940 | 34,861 | 35,791 | 36,730 | 37,679 |
| | | | | | | | | | | | | |
| Professional Fees | - | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | |
| Income After Admin Expense | 27,744 | 28,603 | 29,470 | 30,346 | 31,231 | 32,125 | 33,028 | 33,940 | 34,861 | 35,791 | 36,730 | 37,679 |
| | | | | | | | | | | | | |
| IRC Officer Loan Payment | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 |
| | | | | | | | | | | | | |
| Available for Class 2 Payments | 36,114 | 36,973 | 37,840 | 38,716 | 39,601 | 40,495 | 41,398 | 42,310 | 43,231 | 44,161 | 45,100 | 46,049 |

| Monthly Forecast | Jan, 2015 | Feb, 2015 | March, 2015 | April, 2015 | May, 2015 | June, 2015 | July, 2015 | Aug, 2015 | Sept, 2015 | Oct, 2015 | Nov, 2015 | Dec, 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sales | 1,073,077 | 1,083,807 | 1,094,645 | 1,105,592 | 1,116,648 | 1,127,814 | 1,139,092 | 1,150,483 | 1,161,988 | 1,173,608 | 1,185,344 | 1,197,198 |
| | | | | | | | | | | | | |
| Cost of Goods Sold | | | | | | | | | | | | |
| Coins | 858,461 | 867,046 | 875,716 | 884,474 | 893,318 | 902,251 | 911,274 | 920,387 | 929,591 | 938,886 | 948,275 | 957,758 |
| Commission | 117,824 | 119,002 | 120,192 | 121,394 | 122,608 | 123,834 | 125,072 | 126,323 | 127,586 | 128,862 | 130,151 | 131,452 |
| Total COGS | 976,285 | 986,048 | 995,908 | 1,005,867 | 1,015,926 | 1,026,085 | 1,036,346 | 1,046,710 | 1,057,177 | 1,067,749 | 1,078,426 | 1,089,210 |
| | | | | | | | | | | | | |
| Gross Margin | 96,792 | 97,759 | 98,737 | 99,724 | 100,722 | 101,729 | 102,746 | 103,774 | 104,811 | 105,859 | 106,918 | 107,987 |
| | | | | | | | | | | | | |
| Rent | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 |
| Marion Contract | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| President pay | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| Other employee wage | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 |
| Employee Benefits | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Phone System | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 |
| Parking | 510 | 510 | 510 | 510 | 510 | 510 | 510 | 510 | 510 | 510 | 510 | 510 |
| Coffee Supplier | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 |
| Medica | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 |
| Pitney Bowes | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Pitney Bowes Global | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 |
| Qwest | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 |
| Solutions on Hold | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 |
| Tela, Inc. | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 |
| Transcend Communications | 377 | 377 | 377 | 377 | 377 | 377 | 377 | 377 | 377 | 377 | 377 | 377 |
| US Bank - Copier | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 |
| Wells Fargo Business Loan | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 |
| Total Expenses | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 |
| | | | | | | | | | | | | |
| Operating Income | 38,638 | 39,605 | 40,583 | 41,570 | 42,568 | 43,575 | 44,592 | 45,620 | 46,657 | 47,705 | 48,764 | 49,833 |
| | | | | | | | | | | | | |
| Professional Fees | - | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | |
| Income After Admin Expense | 38,638 | 39,605 | 40,583 | 41,570 | 42,568 | 43,575 | 44,592 | 45,620 | 46,657 | 47,705 | 48,764 | 49,833 |
| | | | | | | | | | | | | |
| IRC Officer Loan Payment | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 |
| | | | | | | | | | | | | |
| Available for Class 2 Payments | 47,008 | 47,975 | 48,953 | 49,940 | 50,938 | 51,945 | 52,962 | 53,990 | 55,027 | 56,075 | 57,134 | 58,203 |

| Monthly Forecast | Jan, 2016 | Feb, 2016 | March, 2016 | April, 2016 | May, 2016 | June, 2016 | July, 2016 | Aug, 2016 | Sept, 2016 | Oct, 2016 | Nov, 2016 | Dec, 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sales | 1,209,170 | 1,221,261 | 1,233,474 | 1,245,809 | 1,258,267 | 1,270,849 | 1,283,558 | 1,296,393 | 1,309,357 | 1,322,451 | 1,335,675 | 1,349,032 |
| **Cost of Goods Sold** | | | | | | | | | | | | |
| Coins | 967,336 | 977,009 | 986,779 | 996,647 | 1,006,613 | 1,016,679 | 1,026,846 | 1,037,115 | 1,047,486 | 1,057,961 | 1,068,540 | 1,079,226 |
| Commission | 132,767 | 134,094 | 135,435 | 136,790 | 138,158 | 139,539 | 140,935 | 142,344 | 143,767 | 145,205 | 146,657 | 148,124 |
| Total COGS | 1,100,102 | 1,111,103 | 1,122,215 | 1,133,437 | 1,144,771 | 1,156,219 | 1,167,781 | 1,179,459 | 1,191,253 | 1,203,166 | 1,215,198 | 1,227,349 |
| **Gross Margin** | 109,067 | 110,158 | 111,259 | 112,372 | 113,496 | 114,631 | 115,777 | 116,935 | 118,104 | 119,285 | 120,478 | 121,683 |
| Rent | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 | 7,053 |
| Marion Contract | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| President pay | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| Other employee wage | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 |
| Employee Benefits | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Phone System | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 |
| Parking | 510 | 510 | 510 | 510 | 510 | 510 | 510 | 510 | 510 | 510 | 510 | 510 |
| Coffee Supplier | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 |
| Medica | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 |
| Pitney Bowes | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Pitney Bowes Global | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 |
| Qwest | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 |
| Solutions on Hold | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 |
| Tela, Inc. | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 |
| Transcend Communications | 377 | 377 | 377 | 377 | 377 | 377 | 377 | 377 | 377 | 377 | 377 | 377 |
| US Bank - Copier | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 |
| Wells Fargo Business Loan | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 |
| Total Expenses | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 | 58,154 |
| **Operating Income** | 50,913 | 52,004 | 53,105 | 54,218 | 55,342 | 56,477 | 57,623 | 58,781 | 59,950 | 61,131 | 62,324 | 63,529 |
| **Professional Fees** | - | - | - | - | - | - | - | - | - | - | - | - |
| **Income After Admin Expense** | 50,913 | 52,004 | 53,105 | 54,218 | 55,342 | 56,477 | 57,623 | 58,781 | 59,950 | 61,131 | 62,324 | 63,529 |
| **IRC Officer Loan Payment** | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 | 8,370 |
| **Available for Class 2 Payments** | 59,283 | 60,374 | 61,475 | 62,588 | 63,712 | 64,847 | 65,993 | 67,151 | 68,320 | 69,501 | 70,694 | 71,899 |

| Monthly Forecast | 2,012 | 2,013 | 2,014 | 2,015 | 2,016 | Total |
|---|---|---|---|---|---|---|
| Sales | 9,511,877 | 10,718,221 | 12,077,560 | 13,609,297 | 15,335,297 | 61,252,252 |
| | | | | | | |
| Cost of Goods Sold | | | | | | |
| Coins | 7,609,502 | 8,574,577 | 9,662,048 | 10,887,438 | 12,268,237 | 49,001,802 |
| Commission | 1,044,404 | 1,176,861 | 1,326,116 | 1,494,301 | 1,683,816 | 6,725,497 |
| Total COGS | 8,653,906 | 9,751,438 | 10,988,164 | 12,381,738 | 13,952,053 | 55,727,299 |
| | | | | | | |
| Gross Margin | 857,971 | 966,784 | 1,089,396 | 1,227,559 | 1,383,244 | 5,524,953 |
| | | | | | | |
| Rent | 84,636 | 84,636 | 84,636 | 84,636 | 84,636 | 423,180 |
| Marion Contract | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 600,000 |
| President pay | 180,000 | 180,000 | 180,000 | 180,000 | 180,000 | 900,000 |
| Other employee wage | 153,600 | 153,600 | 153,600 | 153,600 | 153,600 | 768,000 |
| Employee Benefits | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 60,000 |
| Phone System | 10,356 | 7,800 | 7,800 | 7,800 | 7,800 | 41,556 |
| Parking | 6,120 | 6,120 | 6,120 | 6,120 | 6,120 | 30,600 |
| Coffee Supplier | 900 | 900 | 900 | 900 | 900 | 4,500 |
| Medica | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 | 390,000 |
| Pitney Bowes | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 60,000 |
| Pitney Bowes Global | 5,100 | 3,600 | 3,600 | 3,600 | 3,600 | 19,500 |
| Qwest | 15,600 | 15,600 | 15,600 | 15,600 | 15,600 | 78,000 |
| Solutions on Hold | 480 | 480 | 480 | 480 | 480 | 2,400 |
| Tela, Inc. | 432 | 432 | 432 | 432 | 432 | 2,160 |
| Transcend Communications | 6,030 | 4,524 | 4,524 | 4,524 | 4,524 | 24,126 |
| US Bank - Copier | 9,563 | 6,096 | 6,096 | 6,096 | 6,096 | 33,947 |
| Wells Fargo Business Loan | 12,060 | 12,060 | 12,060 | 12,060 | 12,060 | 60,300 |
| Total Expenses | 706,877 | 697,848 | 697,848 | 697,848 | 697,848 | 3,498,269 |
| | | | | | | |
| Operating Income | 151,094 | 268,936 | 391,548 | 529,711 | 685,396 | 2,026,684 |
| | | | | | | |
| Professional Fees | 100,000 | - | - | - | - | 100,000 |
| | | | | | | |
| Income After Admin Expense | 51,094 | 268,936 | 391,548 | 529,711 | 685,396 | 1,926,684 |
| | | | | | | |
| IRC Officer Loan Payment | 100,440 | 100,440 | 100,440 | 100,440 | 100,440 | 502,200 |
| | | | | | | |
| Available for Class 2 Payments | 151,534 | 369,376 | 491,988 | 630,151 | 785,836 | 2,428,884 |